**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**


**NICOLE KEES,**

        **Petitioner,**

**v.**                                     **Civil Action No. 2:13-cv-34**


**LORI NOHE, Warden**

        **Respondent.**


**REPORT & RECOMMENDATION TO GRANT RESPONDENT'S MOTION**
**FOR SUMMARY JUDGMENT [14] AND TO DISMISS WITH PREJUDICE**
**PETITIONER'S HABEAS PETITION [10]**


**I. INTRODUCTION**

On June 3, 2013, Nicole Kees, Petitioner, filed a petition for a writ of habeas corpus (hereinafter "Petition") pursuant to 28 U.S.C. § 2254, wherein she challenges her state conviction in Berkeley County, West Virginia, as unconstitutional. (ECF No. 10).[1] On June 18, 2013 the Court ordered Respondent to show cause why the petition should not be granted. (ECF No. 11). Respondent filed a motion for summary judgment on July 16, 2013. (ECF No. 14). The Court issued a *Roseboro*[2] notice informing Petitioner of her right to file responsive materials. (ECF No. 17). Accordingly, this matter is now ripe for the Court's review.

---

[1] Petitioner initially filed her Petition for Writ of Habeas Corpus on May 8, 2013 (ECF No. 1) and on May 17, 0213 the Court filed a Notice of Deficient Pleading (ECF No. 8). Petitioner thereafter filed the Petition using the Court-Approved Form on June 3, 2013. (ECF No. 10).

[2] *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975.)

## A. Background

On January 12, 2004, Petitioner, Nicole Kees, and decedent, Jashua Frocke, approached another mutual friend, Aaron Polkey, and offered to pay him $100.00 to drive them to a bank to cash checks. (Resp't Ex. 2, Trial Tr. 78, Sept. 29, 2004). Ms. Kees was twenty-years old and Mr. Frocke and Mr. Polkey were both eighteen years old at the time. On their way to the bank, they stopped at an Exxon gas station where Mr. Frocke used the restroom and Mr. Polkey got gas. (*Id.* at 79). When Mr. Frocke returned to the car, he told Mr. Polkey that he had just injected the last of his heroin. (*Id.* at 106).

Then, they drove to First United Bank in Martinsburg where Mr. Frocke entered the bank to cash a $450.00 check written by Ms. Kees. (*Id.* at 79-80). Mr. Frocke returned to the car with the cash and gave half of the money to Ms. Kees and Mr. Polkey was given $50.00. (*Id.* at 80). Ms. Kees and Mr. Frocke said they needed to visit a second bank in order to cash another check. (*Id.*). They drove to First United Bank in Inwood where Ms. Kees wrote a second check, Mr. Frocke signed the back of the check and they cashed the check using the drive-thru. (*Id.*). Ms. Kees provided Mr. Polkey with the remaining $50.00 and then requested that he drive her to her home in Bunker Hill Heights. (*Id.* at 181). These checks cashed by Mr. Frocke, Ms. Kees and Mr. Polkey had been previously stolen by Mr. Frocke. (*Id.* at 80, 167).

Mr. Polkey then drove Ms. Kees to her Aunt Connie DeHaven's home, where Ms. Kees was living at the time. (*Id.* at 180). Ms. Kees went inside for approximately fifteen minutes and returned to the car with her jacket and Walmart bags filled with her clothes. (*Id.* at 81, 180). Ms. Kees stated her family had found drug paraphernalia and were angry with her. (*Id.* at 81).

Ms. Kees then asked Mr. Polkey to drive to Shutts, a convenience store, located near Route 51. (Resp't Ex. 1, Prelim. Hr'g Tr. 15; Resp't Ex. 2, Trial Tr. 82). Ms. Kees directed Mr. Polkey to drive to a trailer belonging to Eric Jerge and his girlfriend, Crystal Gail Baker, near the Shutts store.[3] (Resp't Ex. 2, Trial Tr. 82). Ms. Kees entered the trailer alone and Mr. Polkey and Mr. Frocke remained in the car. (*Id.* at 182-83). Ms. Kees returned to the car twenty to thirty minutes later and appeared "messed up" as if she had been using drugs while inside the trailer. (*Id.* at 82). While inside the trailer, Ms. Kees allegedly purchased the heroin at issue in this case.

After returning to the car, Ms. Kees asked Mr. Polkey to drive to Sheetz[4] in order to use the restroom and purchase food. (Resp't Ex 1, Prelim. Hr'g Tr. 15; Resp't Ex. 2, Trial Tr. 84). Once at the Sheetz, Ms. Kees and Mr. Frocke went inside and came back out "acting really stupid," which led Mr. Polkey to believe that they used heroin at the Sheetz.[5] (Resp't Ex. 2, Trial Tr. 84).

Ms. Kees then suggested getting a motel room in order to "hang out." (*Id.* at 85). Mr. Frocke wanted to invite Richard Chamblin, another eighteen-year old mutual friend, so they then went to pick him up at his house at approximately 5:30 p.m.. (*Id.* at 85, 130). According to Mr. Chambin's testimony, they stopped at an Exxon in Inwood to use the restroom and buy cigarettes and soda. (*Id.* at 136). Mr. Polkey, Ms. Kees, Mr. Frocke and Mr. Chamblin then went to the Krista Lite Motel in Martinsburg. (*Id.* at 85-86). Ms. Kees and Mr. Frocke entered the motel and checked in to Room No. 22 at

---

[3] It is not known who was present inside **the** trailer during the transaction but Ms. Baker reportedly had no knowledge of any drug transactions occurring at the trailer. (Resp't Ex. 1, Prelim. Hr'g Tr. 22).

[4] The undersigned notes that Shutts convenience store is a separate location from Sheetz.

[5] Mr. Polkey's statement to police also indicated that Ms. Kees and Mr. Frocke perhaps purchased additional "four packs" of heroin, which was split between the two of them, at the Sheetz. (Resp't Ex. 1, Prelim. Hr'g Tr. 16, Resp. Ex. 2, Trial Tr. 103-06).

approximately 7:00 p.m.. (*Id.* at 157-59). The room was reserved under Mr. Frocke's name and the desk clerk working at the motel that night testified that Ms. Kees handed money to Mr. Frocke who then paid for the room. (*Id.* at 159, 160-61).

After entering the motel room, Ms. Kees presented to the group a bag containing approximately one gram of heroin. (Resp't Ex. 1, Prelim. Hr'g Tr. 17; Resp't Ex. 2, Trial Tr. 136). Mr. Frocke asked for his half of the drugs from Ms. Kees, which she provided to him after a dispute that she did not equally split the drugs. (Resp't Ex. 2, Trial Tr. 86-87, 131). Both Ms. Kees and Mr. Frocke then crushed the substance, heated it on a spoon and injected the substance in their arms. (Resp. Ex. 1, Prelim. Hr'g Tr. 17). According to Mr. Polkey, everyone in the room injected heroin; Mr. Polkey ingested a small line of heroin intranasally. (Resp't Ex. 2, Trial Tr. 87, 131). Ms. Kees called to invite Mr. James Lee ("J.L.") Robinson, her boyfriend at the time, to join the group at the motel but he did not answer his phone. (*Id.* at 163).

Later in the evening, after getting home from work, Mr. Robinson received a phone call from Mr. Frocke inviting him to the motel to party. (*Id.* at 162-63). After Mr. Robinson arrived, he went into the bathroom with Mr. Frocke to inject heroin. (*Id.* at 133, 139, 164). At some point during the evening, the group ordered and ate Chinese food. (*Id.* at 88, 134, 165). Ms. Kees, Mr. Frocke and Mr. Polkey also left the motel and went to the mall and then to Walmart to purchase various items. (*Id.* at 89).

After returning from the mall, Ms. Kees and Mr. Frocke both brought out their heroin to share with others in the room. (*Id* at 89). Members of the group continued to inject and snort heroin, often accompanying one another to the bathroom. (*Id.* at 90). Mr. Polkey reported in a statement to police that throughout the night he saw Mr. Frocke

inject heroin approximately three times and Ms. Kees inject heroin two times. (Resp. Ex. 1, Prelim. Hr'g Tr. 17). While Mr. Polkey did not see Mr. Robinson or Mr. Chamblin inject heroin, he reported that they were in the bathroom together. (*Id.*).

At approximately 9:30 p.m., Mr. Chamblin asked Mr. Polkey to drive him home and Mr. Frocke, Mr. Polkey and Mr. Chamblin left the motel. (Resp't Ex. 2, Trial Tr. 90, 134, 139). After dropping Mr. Chamblin off at his home in Bunker Hill, Mr. Polkey and Mr. Frocke returned to the motel; on their way back to the motel, Mr. Frocke vomited on the side of Interstate 81. (*Id.* at 91).

After returning to the motel room, Ms. Kees, Mr. Frocke and Mr. Robinson continued to inject heroin. (*Id.* at 92). At this point, witnesses who testified at trial provided different accounts of how the night ended.

According to Mr. Robinson's testimony, Mr. Frocke began making a bed for himself on the floor and because everyone was going to sleep, he decided to leave the motel with Ms. Kees. (*Id.* at 166-67). Mr. Robinson testified that Mr. Frocke was lying on the floor when he left, Mr. Robinson said goodbye, Mr. Frocke replied "I'll see you later," and Mr. Robinson went outside to start his car. (*Id.* at 166-67). Approximately five minutes later, Ms. Kees exited the motel carrying her bags and he drove her home. (*Id.* at 167). Mr. Robinson testified that when he got home it was approximately 11:50 p.m. and he estimated that he left the motel around 11:00 p.m. or 11:15 p.m.. (*Id.* at 169).

Alternatively, according to Mr. Polkey's testimony, shortly before 11:00 p.m., he received a phone call from his girlfriend and spoke with her on the phone. (*Id.* at 92). During this time, Mr. Frocke went to sleep on a comforter and pillow on the floor. (*Id.*). Ms. Kees interrupted Mr. Polkey and asked to use the phone. (Resp. Ex. 1, Prelim. Hr'g

Tr. 18; Resp't Ex. 2, Trial Tr. 92).  Ms. Kees' Aunt Connie DeHaven testified that she received a phone call from Ms. Kees after 11:00 p.m..  (Resp't Ex. 2, Trial Tr. 181).  While they were talking on the phone, Ms. DeHaven testified that she heard Ms. Kees' exclaim, "oh, my God, no, he's not dead."[6]  (*Id.*).  Ms. Kees said she would call her back and hung up the phone.  (*Id.* at 182).

Mr. Polkey further testified that while Mr. Frocke was on the floor, they "heard Jashua cough and kind of make a gasping noise."  (Resp. Ex. 1, Prelim. Hr'g Tr. 18).  Then, Ms. Kees nudged Mr. Frocke with her foot and explained "oh, my God, he's dead." (Resp't Ex. 2, Trial Tr. 92).  While divergent testimony was presented regarding decisions to call 9-1-1 or not, 9-1-1 was not immediately called by the individuals in the motel room because they were scared to call for help when they were still in the possession of drugs.  (*Id.* at 92-93).[7]  Mr. Polkey testified that he checked Mr. Frocke's body and did not feel a pulse.  (*Id.* at 125-26).  Ms. Kees and Mr. Robinson then left the motel followed by Mr. Polkey who left after he found his lost keys.  (*Id.* at 92).  After leaving the motel, Mr. Polkey stopped at a gas station and called the Krista Lite Motel in order to check on Mr. Frocke but no one answered the phone.  (*Id.* at 93, 126-27).  Ms. DeHaven testified that Ms. Kees returned home at approximately 11:15 p.m..  (*Id.* at 182).  When Ms. DeHaven asked Ms. Kees what transpired at the motel, Ms. Kees stated that a boy was "over-drugged" and "a friend is there with him."  (*Id.* at 189).

---

[6] According to Ms. DeHaven's statement given to police the day after the incident, while she was on the phone with her niece, Ms. Kees exclaimed "this boy is on drugs; no, I don't think he's dead." (Resp't Ex. 2, Trial Tr. 185).

[7] According to Mr. Polkey's statement given to police, Ms. Kees went to the phone to dial 9-1-1 but Mr. Robinson told her to stop because she was in possession of drugs.  (Resp. Ex. 1, Prelim. Hr'g Tr. 18).  Ms. Kees then said she would go to a payphone to call 9-1-1.  (*Id.*).  Mr. Polkey then left the motel once he found his keys at approximately 11:30 p.m..  (*Id.*).  Mr. Polkey went to a Sheetz and then a 7-Eleven in Inwood where he called the motel room but got no answer; he then went home and went to bed.  (*Id.*).

The next morning, January 13, 2004, Jackie Sheppard, a desk clerk at the Krista Lite Motel, received a phone call from Ms. Kees stating that a man stayed in the room overnight and that she left clothes in the motel room and if he did not remove her clothes when he left, she requested the motel staff to bring her clothes to the main office so she could retrieve them later. (*Id.* at 172, 175-76). After this phone call, Mr. Frocke's body was found by the inn-keeper and owner; Ms. Sheppard called 9-1-1. (*Id.* at 173). West Virginia State Police responded to the scene of a reported unintended death at the Krista Lite Motel in Berkeley County at approximately 10:30 a.m.. (Resp't Ex. 1, Prelim. Hr'g Tr. 4; Resp't Ex. 2, Trial Tr. 192, 228).

Police officers located a body on the floor of Room No. 22 at the motel and identified the individual as eighteen-year-old, Jashua Frocke. (Resp't Ex. 2, Trial Tr. 194-95). Inside the motel room, police found a winter jacket that was later identified as belonging to Ms. Kees. (*Id.* at 196). Police searched the jacket and found paperwork, including regional jail paperwork, a note written by Ms. Kees and information related to her arraignment at the City of Martinsburg. (*Id.* at 197). Inside the lining of the jacket, police recovered approximately eight hypodermic needles and small opened plastic baggies consistent with the packaging used for heroin. (Resp't Ex. 1, Prelim. Hr'g Tr. 6, 8; Resp't Ex. 2, Trial Tr. 197). Police also found a "military style camouflage belt," which was tied in a manner consistent with injection techniques, hung on the towel bar by the bathroom in the motel room. (Resp't Ex. 2, Trial Tr. 199-200). When searching the deceased, police found a lighter in his hand and in his pockets found hypodermic needles, a spoon that was burnt underneath and a small cellophane "baggy" from a cigarette

package that contained a small "tan" rock, which was later identified as heroin. (Resp't Ex. 1, Prelim. Hr'g Tr. 6, 24; Resp't Ex. 2, Trial Tr. 202, 226-27).

According to the Berkeley County Medical Examiner, Mr. Frocke "died as a result of heroin intoxication in the setting of intravenous drug abuse," (Resp't Ex. 1, Prelim. Hr'g Tr. 35), meaning that Mr. Frocke "died as a result of a heroin overdose" (Resp't Ex. 2, Trial Tr. 145). Based on a toxicology report, morphine was present in the decedent's blood "at levels that would be expected to cause respiratory arrest and death." (*Id.* at 144). The chief toxicologist at the Office of the Chief Medical Examiner determined that the source of the morphine in Mr. Frocke's blood originated as heroin. (*Id.* at 153). Alcohol and other drugs, besides nicotine, were not detected in Mr. Frocke's blood or urine. (*Id.* at 152).

On January 13, 2004, at approximately 5:30 p.m., investigating Officer Dyroff visited Ms. Kees at her home in Bunker Hill to conduct an initial interview.[8] (Resp't Ex. 1, Pretrial Hr'g Tr. 15; Resp't Ex. 2, Trial Tr. 206). Ms. Kees' Aunt Connie DeHaven stated that Ms. Kees was sleeping but invited Trooper Dyroff and Trooper Copson into the home. (Resp't Ex. 1, Pretrial Hr'g Tr. 15). According to Ms. DeHaven, Ms. Kees appeared to be intoxicated and when she woke her up "she didn't act like she knew where she was, and her eyes were…like a wild person." (Resp't Ex. 2, Trial Tr. 187). Ms. Kees woke up and the officers interviewed her at the kitchen table. (Resp't Ex. 1, Pretrial Hr'g Tr. 15; Resp't Ex. 2, Trial Tr. 206).

---

[8] Ms. Kees was initially identified because the desk clerk at the motel informed Trooper Dyroff that she received a phone call the morning of January 13, 2004 from Ms. Kees stating that she left a jacket in the room where Mr. Frocke's body was found. (Resp't Ex. 2, Trial Tr. 172). Officer Dyroff also spoke with Ms. Chamblin, with whom Mr. Frocke was living at the time, who provided the officer with Ms. Kees name. (Resp't Ex. 2, Trial Tr. 205). Additionally, Mr. Frocke's girlfriend, Bobby Joe West, and his girlfriend's mother stated that Ms. Kees had been affiliated with Mr. Frocke. (Resp't Ex. 1, Pretrial Hr'g Tr. 14-15; Resp't Ex. 2, Trial Tr. 204).

Trooper Dyroff testified at the preliminary hearing that Ms. Kees was informed of her *Miranda* rights during this interview. (Resp't Ex. 1, Pretrial Hr'g Tr. 16). The officers conducted an interview and took notes of their conversation with Ms. Kees, which Ms. Kees signed. (Resp't Ex. 1, Pretrial Hr'g Tr. 16; Resp't Ex. 2, Trial Tr. 207). The last statement on the paper indicates that Ms. Kees was told and understood her *Miranda* rights. (Resp't Ex. 1, Pretrial Hr'g Tr. 16). Officer Dyroff testified that Ms. Kees appeared as if she had just woken up prior to the interview but after a few minutes "she was up and speaking as clear as I am to you right now" and she did not appear to be under the influence of any drugs. (Resp't Ex. 1, Pretrial Hr'g Tr. 17).

After interviewing Ms. Kees, police spoke with three other individuals who were identified as previously being in the room the night of the incident: Richard Chamblin, Aaron Christopher Polkey and James Robinson, III. (Resp't Ex. 1, Prelim. Hr'g Tr. 5-34; Resp't Ex. 2, Trial Tr. 218). After interviewing these individuals, police developed Ms. Kees as the primary suspect. (Resp't Ex. 1, Prelim. Hr'g Tr. 6).

On January 14, 2004, Ms. Kees appeared before the Berkeley County Circuit Court with appointed counsel from the Public Defender's office for a commitment hearing, which was requested by her Aunt Connie DeHaven due to Ms. Kees' substance abuse. (Resp't Ex. 7, Involuntary Hospitalization Order at 1; Resp't Ex. 2, Trial Tr. 185). The court found probable cause to believe Petitioner was addicted based on her own admission of injecting heroin on a daily basis; Petitioner also requested assistance to address her addiction. (Resp't Ex. 7, Involuntary Hospitalization Order at 2). The court did not find Petitioner to be mentally ill at this time. (*Id.*). Petitioner was committed to a rehabilitation facility to address her addiction. (*Id.*).

Trooper Dyroff attempted to speak with Ms. Kees while she was admitted to the facility. (Resp't Ex. 1, Prelim. Hr'g Tr. 27). While speaking to her over the phone, Ms. Kees indicated that she would be willing to talk to police regarding the incident. (*Id.*). Ms. Kees had prior counsel assigned at her commitment hearing who stated they would like to be present for any questioning of their client. (*Id.*). After speaking with the county prosecutor, Trooper Dyroff decided not to interview Ms. Kees while she was committed to the facility. (*Id.*).

On January 21, 2004, Police obtained a warrant for Ms. Kees' arrest for felony murder. (*Id.* at 8-9). Police intended to arrest Ms. Kees at a separate hearing she had been summonsed to appear for at the county courthouse. (*Id.* at 8). Ms. Kees failed to appear and a felony capias was issued for her arrest. (*Id.* at 8-9). Ms. Kees bail bondsman, Mr. Vannoy, found and secured Ms. Kees and turned her over to police custody. (*Id.* at 9). State Police Trooper Richard T. Dyroff and Russell Shackelford with the Criminal Investigation Division of the Berkeley County Sheriff's Department informed Ms. Kees she was under arrest for murder and handcuffed Ms. Kees. (*Id.* at 9, 19; Resp't Ex. 2, Trial Tr. 220).

When being transported to the courthouse for her arraignment, Ms. Kees attempted to make several statements to the transporting officers. (Resp't Ex. 1, Prelim. Hr'g Tr. 9). The officers testified that they repeatedly tried to stop Ms. Kees from making any statements. (*Id.*). According to Officer Shackelford, Petitioner was calm but "concerned with what was transpiring," she appeared lucid and "understood what was going on." (*Id.*). Trooper Dyroff explained he was conducting a murder investigation regarding Mr. Frocke's death. (*Id.*). While in the car, Trooper Dyroff informed Ms.

Kees of her *Miranda* rights and Ms. Kees indicated she understood her rights. (*Id.;* Resp't Ex. 2, Trial Tr. 220). Trooper Dyroff also told Ms. Kees that "he felt that she may be still represented by the Public Defender's Office and she had a right not to answer any questions" (Resp't Ex. 1, Prelim. Hr'g Tr. 9). Ms. Kees indicated she understood this right but still attempted to engage in conversation with the officers. (*Id.*). Both officers testified that Ms. Kees asked very specific and pertinent questions related to the investigation and that she did not appear to be intoxicated or incoherent during the transport. (*Id.* at 10).

State Police Trooper Richard T. Dyroff testified that he read Ms. Kees her *Miranda* rights again after they arrived at the county courthouse. (*Id.*; Resp't Ex. 1, Pretrial Hr'g Tr. 22; Resp't Ex. 2, Trial Tr. 221). At the courthouse, Ms. Kees indicated she was aware she may have counsel and waived the right to have counsel present during any questioning. (Resp't Ex. 1, Prelim. Hr'g Tr. 10; Resp't Ex. 1, Pretrial Hr'g Tr. 22). Trooper Dyroff testified that Ms. Kees signed a written document acknowledging the waiver of her *Miranda* rights (*Id.*), however, the official DPS Form indicating a waiver of *Miranda* rights was never provided to or signed by Ms. Kees. (Resp't Ex. 1, Pretrial Hr'g Tr. 4; Resp't Ex. 2, Trial Tr. 221-22).

Trooper Dyroff then obtained a handwritten statement signed by Ms. Kees. (Resp't Ex. 1, Prelim. Hr'g Tr. 10; Resp't Ex. 2, Trial Tr. 223-24). In this statement, Ms. Kees admitted to purchasing the heroin "for Jash, and myself and Polkey." (Resp't Ex. 1, Prelim. Hr'g Tr. 10-11; Resp't Ex. 2, Trial Tr. 224). Ms. Kees stated that once at the motel "Jash got his half from me." (Resp't Ex. 1, Prelim. Hr'g Tr. 11; Resp't Ex. 2, Trial Tr. 224). Ms. Kees stated that Jash had half a gram of heroin but she did not know how

much he used that night; she further stated that the last time he injected heroin, James Robinson "shot him up." (*Id.*). Trooper Dyroff also asked Ms. Kees a series of questions, which he recorded on a piece of paper writing both his question and her answer in full. (Resp't Ex. 1, Prelim. Hr'g Tr. 31). During this questioning, Trooper Dyroff reported that Ms. Kees appeared oriented with normal demeanor and appearance. (*Id.* at 32).

### B. State Proceedings

On May 20, 2004, a Grand Jury for the Circuit Court of Berkeley County, West Virginia returned a six (6) count indictment against Petitioner. (Resp't Ex. 1, Indictment at 1-4). Count One charged Petitioner with felony murder in the commission of delivery of a controlled substance, to wit: heroin, in violation of W. Va. Code § 61-2-1. (*Id.* at 1). Count Two charged Petitioner with unlawful delivery of a controlled substance, in violation of W. Va. Code § 60A-4-401(a)(i). (*Id.*). Counts Three and Five charged Petitioner with forgery of checks, in violation of W. Va. Code § 61-4-5. (*Id.* at 2-3). Counts Four and Six charged Petitioner with uttering or attempting to employ as true a forged check, in violation of W. Va. Code § 61-4-5. (*Id.* at 2-3).

B. Craig Manford, Esquire was appointed as Petitioner's attorney on the charge of felony murder per order entered on January 28, 2004. (Resp't Ex. 8, Order Den. Am. Pet. for Writ of Habeas Corpus at 2).

At a pre-trial hearing in Berkeley County Circuit Court on September 17, 2004, the Court discussed Petitioner's Motion to Suppress. (Resp't Ex. 1, Pretrial Hr'g Tr. 4, Pretrial Hr'g Order at 1). Petitioner sought to suppress statements she made during her initial interview with investigating officers and following her arrest on felony murder

charges. (Resp't Ex. 1, Pretrial Hr'g Tr. 4). During the hearing, Petitioner's counsel cross-examined the investigating officers regarding Petitioner's interviews with the officers and questioned the officers regarding Petitioner's state of mind when waiving her *Miranda* rights to determine whether Petitioner was competent in order to knowingly, intelligently and voluntarily waive her rights. (Resp't Ex. 1, Pretrial Hr'g Tr. 8-29). After hearing the testimony of the officers, the Court found that Petitioner's statements during the non-custodial interview at her home were voluntary and thus admissible. (Resp't Ex. 1, Pretrial Hr'g Order at 2). The Court further found that Petitioner made several excited utterances following her arrest; she was repeatedly advised of her right to remain silent but continued to speak; she received *Miranda* warnings verbally and in writing at the courthouse, and she voluntarily gave a statement to law enforcement; thus the Court ruled that the excited utterances and Petitioner's second statement at the courthouse were admissible. (*Id.* at 1-2).

Also during the pre-trial hearing, the Court agreed to accept a written immunity agreement granting Mr. Polkey immunity as to the forgery and uttering charges referenced in the case in exchange for his testimony at Petitioner's trial. (Resp't Ex. 1, Pretrial Hr'g Tr. 5). Petitioner's counsel did not object to the grant of immunity or the introduction of these utterings at trial. (*Id.* at 6). Additionally, the Court placed upon the record the State's plea offer, which required Petitioner to plead guilty to first degree felony murder with the stipulation of mercy. (*Id.* at 7; Resp't Ex. 1, Pretrial Hr'g Order at 2). Petitioner rejected the offer "in that we feel we'll get mercy anyway. We would rather take our chances with the jury." (Resp't Ex. 1, Pretrial Hr'g Tr. 7-8).

Petitioner's two-day jury trial for Counts One and Two of the indictment commenced on September 29, 2004. (Resp't Ex. 2 & 3). When the State closed their case-in-chief, the state prosecutor elected to proceed with the felony murder charge and dismissed Count Two, delivery of a controlled substance. (Resp't Ex. 3, Trial Tr. 3, Sept. 30, 2004). Petitioner did not testify and Petitioner's counsel did not call any additional witnesses. (*Id.* at 13). On September 30, 2004, the jury found the Petitioner guilty of murder in the first degree under the felony murder doctrine of the delivery of a controlled substance. (*Id.* at 69). The jury attached mercy to the verdict. (*Id.*).

On January 7, 2005, Petitioner accepted a plea agreement and pled guilty to Counts Three and Five of the indictment charging her with two counts of felony forgery. (Resp't Ex. 4, Pet. for Appeal at 2). The State agreed to dismiss Counts Four and Six for uttering a forged check. (*Id.*).

On February 15, 2005, the Circuit Court sentenced Petitioner to life in prison with eligibility for parole in fifteen (15) years based on the jury's recommendation of mercy. (*Id.*). Petitioner was further sentenced to not less than one nor more than ten years on each of the two forgery convictions, with the sentences to run consecutively to each other, but concurrently to the life sentence. (*Id.*).

Defense counsel filed a post-verdict Motion for a New Trial and/or Judgment Notwithstanding the Verdict of the Jury, which was denied by the Berkeley County Circuit Court on February 15, 2005. (*Id.* at 1).

On May 11, 2007, the Berkeley County Circuit Court entered an Order re-sentencing Petitioner, which allowed her to timely file her direct appeal. (Resp't Ex. 4, Agreed Order Re-Sentencing Def.). On November 21, 2007, Petitioner, represented by

her trial counsel, Mr. Manford, made a direct appeal to the West Virginia Supreme Court of Appeals. (Resp't Ex. 4, Pet. for Appeal at 1-32). Petitioner raised four assignments of error:

1) the Court erred by failing to direct a verdict in favor of Petitioner at the close of evidence and/or the Jury's verdict was contrary to the evidence presented;
2) the Court erred by denying Defendant's proffered jury instruction on the lesser included offense of delivery of a controlled substance;
3) the Prosecuting Attorney misstated the law regarding the offense of possession of a controlled substance in her rebuttal closing argument; and,
4) the cumulative weight of all these errors warrant a new trial.

(*Id.* at 19).

On April 24, 2008, the Supreme Court of Appeals denied the Petition to Appeal, with Justices Starcher and Albright ruling to grant the Petition. (Resp't Ex. 5).

On August 12, 2008, Petitioner filed a *pro se* writ of habeas corpus in state court. (Resp't Ex. 6). On August 25, 2008, the court entered an Order appointing Christopher J. Prezioso, Esquire as post-conviction counsel. (Resp't Ex. 8, Order Den. Am. Pet. for Writ of Habeas Corpus at 4). On July 7, 2010, Petitioner, through her counsel, filed her amended Petition for Writ of Habeas Corpus to the Circuit Court of Berkeley County. (Resp't Ex. 7). The Petition claimed:

1) Ineffective assistance of counsel for eight different issues;
2) Violation of due process for failure to suppress Petitioner's statements;
3) Cruel and unusual sentence in violation of the Eighth amendment;
4) Violation of due process by the State's witnesses giving false testimony;
5) Violation of due process based on insufficient evidence to convict;
6) Violation of due process because Petitioner lacked competency to stand trial;
7) Violation of due process and Eighth amendment because the West Virginia felony murder statute is unconstitutional; and,
8) Seven remaining grounds, including that the indictment failed to show on is face that an offense was committed, erroneous information in presentence investigation, irregularities in arrest, excessiveness in bail, improper use of informers, prejudicial statements made by prosecutor, and excessive sentence.

(Resp't Ex. 8, Order Den. Am. Pet. for Writ of Habeas Corpus at 4). On September 21, 2011, the state habeas court denied the Petition. (*Id.* at 1-25).

On October 20, 2011, Petitioner appealed to the West Virginia State Supreme Court. On January 14, 2013, the West Virginia State Supreme Court denied relief and affirmed the state court's denial of Petitioner's habeas petition. (Resp't Ex. 9, Mem. Decision at 1-2). The instant petition timely followed.

## II. STANDARD OF REVIEW

Summary judgment is appropriate in those cases where there is no genuine dispute as to any material fact, and it appears that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c)(2); *United States v. Lee*, 943 F.2d 366, 368 (4th Cir. 1991). Any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). Where, however, the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

In viewing the motion for summary judgment, the Court must do so under the constraints imposed by the habeas statue. Under § 2254, this Court may not grant federal habeas relief unless it concludes that West Virginia's adjudication of the claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1); *see also Williams v. Taylor*, 529 U.S. 362 (2000). A state court decision is "contrary to . . . clearly established Federal law, as determined by the Supreme Court," 28 U.S.C.A. §

2254(d)(1), "if the state court arrives at a conclusion opposite to that reached by the Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 405. A state court decision "involves an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court," 28 U.S.C.A. § 2254(d)(1), if the state court decision "identifies the correct governing legal principle from the Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 412. An objectively "unreasonable application of federal law is different from an incorrect or erroneous application of federal law." *Id*. Thus, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable" for habeas relief to be granted. *Id*. at 411.

As these principles make clear, § 2254(d) imposes a powerful limit on the relitigation of claims that have already been rejected by state courts:

> [Section 2254(d)] preserves authority to issue the writ in cases where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement.

*Harrington v. Richter*, 131 S.Ct. 770, 786–87 (2011). A habeas petitioner proceeding under § 2254 bears the burden of showing that he is entitled to habeas relief under this highly deferential standard.

Finally, determinations of factual issues by the state court are presumed to be correct, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This standard "reflects Congress's view that there is no reason for a do-over in federal court when it comes to facts already resolved by state tribunals." *Id*. Accordingly, courts should not "casually cast aside a state court's factual findings. *Id*.

## III. DISCUSSION

Petitioner raised four grounds in her Petition. (ECF No. 10-1). However, as indicated in Respondent's Answer to the Petition some of Petitioner's claims overlap. Therefore, the Respondent separated the grounds into eleven separate claims. (ECF No. 13). The Court will address Petitioner's claims based on ten grounds, even though some of the claims overlap in subject matter and the constitutional questions raised.

### 1. Insufficient Evidence to Sustain Verdict

Petitioner claims that there was insufficient evidence to prove she committed the underlying offense of delivery of a controlled substance as required to find her guilty of felony murder. (Petition, ECF No. 10-1 at 1, 3). In furtherance of this claim, Petitioner

argues that the State's dismissal of Count Two of the indictment charging her with delivery of a controlled substance indicates that sufficient evidence did not exist to convict Petitioner of the underlying predicate offense of delivery needed to sustain her felony murder conviction. In her direct appeal, Petitioner argued that both she and the decedent "jointly owned and possessed the drugs" and thus the decedent never received a "delivery of the drugs from Petitioner." (Resp't Ex. 4, Pet. for Appeal at 24). Petitioner then cited to a number of cases from other jurisdictions holding that the felony murder rule did not apply when a joint possessor of drugs dies as a result of a drug overdose. (*Id.* at 20). Moreover, Petitioner argued in her state habeas petition that just because she entered the trailer to purchase the drugs does not mean she then later "delivered" the drugs to the decedent. (Resp't Ex. 7, Am. Pet. for Writ of Habeas Corpus at 17). Instead, she argues that "the delivery occurred when the individual in the trailer gave drugs to Petitioner for the benefit of Petitioner and every individual in the Krista Lite Motel room at the time of the incident." (*Id.*). In sum, Petitioner's argument centers on her merely jointly possessing the drugs with the decedent, rather than "delivering" the heroin to Mr. Frocke, as required to uphold her felony murder conviction.

The state habeas court found that sufficient evidence existed to convict Petitioner of felony murder for the predicate offense of delivery of a controlled substance.[9] (Resp't Ex. 8, Order Den. Am. Pet. for Writ of Habeas Corpus at 20). The court

---

[9] Under West Virginia state law, the term "deliver" is defined as "the actual, constructive, or attempted transfer from one person to another of (1) a controlled substance, whether or not there is an agency relationship…." W. Va. Code § 60A-4-401(a). The delivery must be intentional or knowing. Syl. Pt. 3, *State v. Dunn*, 162 W. Va. 63, 246 S.E. 2d 245 (1978). The elements of felony murder under West Virginia state law require: "(1) the commission of, or attempt to commit, one or more of the enumerated felonies; (2) the defendant's participation in such commission or attempt; and (3) the death of the victim as a result of injuries received during the course of such commission or attempt." Syl. Pt. 5, *State v. Mayle*, 178 W. Va. 26, 357 S.E.2d 219 (1987), *citing State v. Wilhams*, 172 W. Va. 294, 311, 305 S.E.2d 251, 267 (1983).

emphasized that under state law Petitioner was facing a heavy burden because a jury verdict should only be set aside when the record contains no evidence from which a jury could find guilt beyond a reasonable doubt. (*Id.*). The court found that "there is direct testimony that Petitioner bought the drugs and gave them to the victim. In fact the transcript from the trial shows that there was evidence of each element of the crime." (*Id.* at 21). The state habeas court further dismissed Petitioner's reliance on case law from other jurisdictions, which held that the felony murder doctrine does not apply to deaths stemming from jointly acquired and possessed drugs. (*Id.*). The court stated that these extrajurisdictional cases are "not the situation in West Virginia, that is not the same as the facts in this case, and that argument bears no light on the sufficiency of the evidence." (*Id.*). The court concluded that there was no merit to Petitioner's contention and dismissed Petitioner's argument that insufficient evidence existed to convict. (*Id.*).

A federal habeas court sitting in review of a state court conviction may entertain a sufficiency of the evidence claim. *See Jackson v. Virginia*, 443 U.S. 307 (1979). To be successful in this claim, Petitioner would have to show that upon the record evidence adduced at the trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. *Id.* at 319. Based on this standard, the Court agrees with the Supreme Court of Appeals of West Virginia and the state habeas court that sufficient evidence to convict existed; specifically, sufficient evidence existed to allow the jury to find beyond a reasonable doubt that Petitioner delivered the controlled substance to the decedent.

Here, the state of West Virginia presented multiple witnesses to the jury who provided testimony that Petitioner delivered drugs to the decedent. (Resp't Ex. 2, Trial

Tr. 2-3, Sept. 29, 2004). Mr. Polkey, Mr. Chamblin and Mr. Robinson, three individuals who were in the motel room that night, each testified that Petitioner "gave" Mr. Frocke his half of the heroin at the motel. (*Id*. at 77, 129,161). When asked how the drugs got in the motel room, Mr. Polkey testified "Nicole…It came out of Nicole's purse. Jash wanted to know where his cut was, something like that, and they brought it all out. She brought it out and then gave Jash some." (*Id*. at 86). Mr. Chamblin testified that "Nicole pulled out the drugs, and Nicole and Jash split theirs up…Nicole gave Jash his half and she kept hers." (*Id*. at 131). Mr. Robinson testified that the heroin belonged to both Mr. Frocke and Ms. Kees that he heard them "arguing about [how] she already gave him his half of the heroin." (*Id*. at 166-67). The testimony by each of these witnesses describes Petitioner taking heroin from her person and giving it to the decedent. This testimony is sufficient evidence for the jury to rely upon in finding that Petitioner delivered heroin to Mr. Frocke as required to support the underlying felony of delivery of a controlled substance for the felony murder conviction.

Moreover, Petitioner's own statements to police indicated that she gave the heroin to the decedent. The last witness called by the State was Corporal Dyroff, the State Police Trooper in charge of the investigation, who read into evidence Petitioner's statement made to police after her arrest indicating that she gave the drugs to Mr. Frocke:

> Question: Who brought the heroin to the motel room on 1-12-04?
> Answer: Me and Jash
> Question: Who had it?
> Answer: Jash got his half and I got my half.
> Question: Where did Jash get his half?
> Answer: I went into Eric's trailer because I knew his girlfriend. I purchased the heroin for Jash and myself and Polkey. We left and went to the motel. Jash got his half from me.

(*Id*. at 224). Petitioner's own statement also provided sufficient evidence for the jury to find that Petitioner in fact "delivered" the heroin to Mr. Frocke by purchasing it and then giving Mr. Frocke his portion.

As stated above, the Court's review of a sufficiency of evidence claim requires Petitioner to show that upon the record evidence adduced at the trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. While Petitioner's trial counsel presented a compelling argument that Petitioner and the decedent jointly possessed the heroin, the jury had evidence before it to support its verdict that Petitioner's actions constituted "delivery." Three witnesses who were in the motel room the night of the incident each testified that Petitioner "gave" the heroin to the decedent. Moreover, Petitioner admitted to the police that she purchased the heroin and then gave the heroin to the decedent. These statements provided sufficient evidence for the jury to determine that in purchasing and then giving the heroin to the decedent, Petitioner "delivered" the heroin as required to sustain the felony murder conviction. Accordingly, no relief can be granted on this ground.

Moreover, Petitioner misinterprets the State's decision to elect to proceed with the felony murder charge and dismiss Count Two (delivery of a controlled substance) at the close of the State's case-in-chief. (*See* Resp't Ex. 3, Trial Tr. 3, Sept. 30, 2004). At trial the state prosecutor stated "the law requires me to elect, and the State elects the murder charge." (*Id*.). Petitioner appears to interpret the State's election to proceed with the felony murder charge and the dismissal of Count Two as demonstrating that evidence did not exist to support the separate charge of delivery of a controlled substance. However,

the law required the State to elect to move forward with one charge or the other because under double jeopardy the State could not convict Petitioner on both the delivery of a controlled substance and felony murder when the underlying offense for the felony murder charge is also delivery of a controlled substance. The West Virginia Supreme Court of Appeals held that "where a defendant had been convicted of felony-murder, double jeopardy would prohibit a second trial of the defendant on the underlying felony of robbery." *State v. Williams*, 172 W. Va. 295, 310, 305 S.E.2d 251, 267 (1983). The Court further explained that "if the defendant were convicted of and sentenced to imprisonment for both murder and robbery, his sentence would violate the double jeopardy prohibition against multiple punishments." *Id.*, *citing State ex rel. Hall v. Strickler*, 168 W.Va. 496, 285 S.E.2d 143 (1981). Therefore, the dismissal of Count II was not based on the lack of evidence of delivery but rather because double jeopardy prevented the State from obtaining a conviction on both the underlying felony and felony murder.

### 2. Insufficient Evidence to Sustain Verdict

Petitioner also claims that insufficient evidence exists to prove that Petitioner was the actual cause of Mr. Frocke's death. (Petition, ECF No. 10-1 at 2-3). Petitioner argues that Mr. Frocke "ingested jointly acquired and possessed heroin" and that everyone at the motel room that night "shared" the heroin. (*Id.*). Specifically, Petitioner argues that the heroin was divided among the individuals in the motel room and each person voluntarily ingested the drug, including Mr Frocke. (*Id.*). Further, she claims that Mr. Frocke injected heroin multiple times on the day of his death, including the use of heroin from his "own personal stash." (*Id.*).

The state habeas court found that this contention had no merit and that sufficient evidence existed from which a jury could find guilt beyond a reasonable doubt as stated above. (Resp't Ex. 8, Order Den. Am. Pet. for Writ of Habeas Corpus at 20). The Court finds that this is not contrary to, or an unreasonable application of clearly established federal law.

As mentioned above, it is clearly established federal law that to be successful in this claim, Petitioner would have to show that upon the record evidence adduced at the trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. Here, the state put multiple witnesses on the stand that testified Petitioner brought approximately one gram of heroin into the motel room, divided the heroin in half and provided Mr. Frocke with his portion of the drugs. (Resp't Ex. 2, Trial Tr. 77, 105, 129,161, 224). Additionally, the State called both the Chief Medical Examiner, who confirmed that Mr. Frocke died as a result of a heroin overdose (*Id*. at 141), and the Chief Toxicologist, who testified that the source of morphine in the decedent's blood originated as heroin (*Id*. at 149).

Based on the testimony and evidence presented, the Court cannot say that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. The jury appears to have taken the case seriously, as indicated by defense counsel's statement in his closing that the jury had been attentive throughout the trial. (Resp't Ex. 3, Trial Tr. 40). The jury also attached mercy to the verdict, which further demonstrates that the jury considered the facts carefully rather than merely returning a guilty verdict. (*Id*. at 69). Accordingly, no relief can be granted.

*3. Constitutionality of State Felony Murder Statute*

Petitioner challenges the constitutionality of West Virginia's felony murder statute, W. Va. Code § 61-2-1, as applied to the facts of her case. (Petition, ECF No. 10-1 at 1). In her amended petition to the state habeas court, Petitioner claimed the statute violated due process and the Eighth Amendment. (Resp't Ex. 7, Am. Pet. for Writ of Habeas Corpus at 19). Petitioner claims that "[a]ll persons who ingested heroin in that motel room at the time of the incident did so willingly and knowingly" and that her actions only constituted sharing drugs "jointly purchased." (Petition, ECF No. 10-1 at 2). Petitioner further argues that "a willful participant who did nothing more than share the drugs jointly purchased is now serving a sentence of life in prison. Any statute that allows a person to serve a life sentence based on her inaction has to be considered unconstitutional." (*Id*.).

The state habeas court found that this claim had been waived because it was not raised on direct appeal. (Resp't Ex. 8, Order Den. Pet. for Writ of Habeas Corpus at 23). The court further acknowledged that while Petitioner raised ineffective assistance of appellate counsel, the court found that issue to lack merit. (*Id*.). Additionally, the court found that Petitioner failed to "advance any legal authority or factual basis for the claim." (*Id*.).

The Court finds that the state habeas court's determination on this issue is not contrary to, or an unreasonable application of, any clearly established federal law. The Fourth Circuit has held that "the State is free to define for itself the elements of a crime so long as its definition does not offend some deeply rooted principle of justice." *Field v. Sheriff of Wake Cnty., N. Carolina*, 831 F.2d 530, 534 (4th Cir. 1987), *citing McMillan v. Pennsylvania*, 477 U.S. 79, 85, 106 S.Ct. 2411, 2416, (1986). In essence, what Petitioner

is asking this Court to do is tell West Virginia how to write its criminal statutes. This Court must concede that the legislature of West Virginia decided that delivery of a controlled substance may be a predicate felony used to sustain a felony murder conviction. Additionally, the Court provides great deference to the state courts of West Virginia that upheld Petitioner's conviction under the state felony murder statute. Accordingly, no relief can be granted.

*4. Cruel and Unusual Punishment*

Petitioner claims that her sentence with mercy is "excessive, cruel and unjust" because "she did not sell drugs, she *shared* drugs." (Petition, ECF No. 10-1 at 3). In her amended petition to the state habeas court, Petitioner argued that receiving a life sentence with a recommendation of mercy, which allows for parole eligibility after fifteen years imprisonment, is disproportionate to her crime. (Resp't Ex. 7, Am. Pet. for Writ of Habeas Corpus at 11).

The state habeas court found that this claim had been waived because it was not raised on direct appeal. (Resp't Ex. 8, Order Den. Pet. for Writ of Habeas Corpus at 18). The court further acknowledged that while Petitioner raised ineffective assistance of appellate counsel, the court found that issue to lack merit. (*Id*.). Even if considering the claim on the merits, the court found that there must be "gross disproportionality" in order to determine a sentence is cruel and unusual. (*Id*., *citing Graham v. Flordia*, 130 S. Ct. 2011 (2010)). The state habeas court therefore held the contention had no merit and did not warrant an evidentiary hearing. (*Id*.). The Court finds that this is not contrary to, or an unreasonable application of clearly established federal law.

The United States Supreme Court's precedents on the Eighth Amendment "have not been a model of clarity." *Lockyer v. Andrade*, 538 U.S. 63, 72 (2003). "[O]ne governing legal principle emerges as clearly established under § 2254(d)(1): A gross disproportionality principle is applicable to sentences for terms of years." *Id.* Even the precise contours of this principle are unclear, though, and only apply in the "exceedingly rare and extreme case." *Id.* at 73 (internal quotations omitted). In *Lockyer*, the Supreme Court was faced with a California man sentenced to life in prison based on that state's habitual offender law (i.e., "three strikes" rule), and the basis for the third conviction was stealing $150.00 in videotapes. The Court found, on 2254 review, that the sentence did not violate the Eighth Amendment. One factor the Court considered was that the life sentence in that case had an eligibility of parole.

Similarly here, Petitioner was sentenced to life on a felony murder charge, a charge much more serious than the petty theft offense at issue in *Lockyer*. Moreover, the life sentence contains an eligibility of parole. Although very harsh, Petitioner's sentence is not an "extraordinary case" in light of the Supreme Court's history with respect to review of state sentences. Furthermore, under Fourth Circuit precedent, "outside the context of a capital sentence, a proportionality review is necessary only with respect to sentences of life imprisonment without the possibility of parole." *Beverati v. Smith*, 120 F.3d 500, 504-05 (4th Cir. 1997). Accordingly, the Court finds that the state court's sentence of life in prison is not contrary to, or an unreasonable application of, clearly established federal law, and no relief can be granted.

*5. Jury Instructions*

Petitioner contends that the trial court's "denial of Petitioner's proffered lesser-included offense instruction is in complete violation of Petitioner's due process rights as guaranteed by [the] U.S. Constitution." (Petition, ECF No. 10-1 at 2). Petitioner raised this claim in her direct appeal, which was summarily denied by the West Virginia Supreme Court of Appeals. (*See* Resp't Ex. 5). The Fourth Circuit Court of Appeals has determined that "the phrase 'adjudication on the merits' in section 2254(d) excludes only claims that were not raised in state court, and not claims that were decided in state court, albeit in a summary fashion." *Thomas v. Taylor*, 170 F.3d 466, 475 (4th Cir. 1999). When a state court summarily rejects a claim and does not set forth its reasoning, the federal court independently reviews the record and clearly established Supreme Court law. *See Bell v. Jarvis*, 236 F.3d 149 (4th Cir. 2000) cert. denied, 524 U.S. 830 (2001)(*quoting Bacon v. Lee*, 225 F.3d 470, 478 (4th Cir. 2000)). However, the court must still "confine [its] review to whether the court's determination 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Id.* at 158.

In her direct appeal, Petitioner argued that the trial court committed "plain and prejudicial error" by denying her proffered lesser included offense instructions on the lesser included offense of delivery of a controlled substance or possession of a controlled substance. (Resp't Ex. 4 at 27-28). Petitioner argued that "it is impossible to commit the crime of delivery of a controlled substance without first possessing…a controlled substance." (*Id.*). Petitioner cited to West Virginia Supreme Court of Appeals cases that held lesser included offense instructions were not required when the facts or theories of

the defendants' cases did not warrant or support such instructions. (*Id.* at 28). Petitioner distinguished her case because her "entire theory of the case was that she only jointly possessed the heroin in question with the decedent and not that she delivered it." (*Id.*). In concluding, Petitioner argued that:

> the jury could have easily found no delivery took place and thus could have alternatively found the Petitioner guilty of possession. The jury left with a nothing or all decision and blinded by the death of an 18 year old adolescent, chose to find the Appellant guilty rather than let her go 'scot free.'

(*Id.*).

As mentioned above, the Court's review of this claim is still confined "to whether the court's determination 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Bell,* 236 F.3d at 158. The Fourth Circuit has held "that the question on collateral review is whether the challenged instruction by itself so infected the entire trial that the conviction violated due process*." Daniel v. State of W.Va.*, 964 F. Supp. 1050, 1065 (S.D.W. Va. 1997)(*citing Cooper v. North Carolina*, 702 F.2d 481, 483 (4th Cir.1983)). Additionally, the undersigned notes that "normally…instructions to the jury in state trials are matters of state law and procedure not involving federal constitutional issues." *Grundler v. North Carolina*, 283 F.2d 798, 802 (4th Cir. 1960). To state a federal constitutional claim with regard to a jury instruction, a petitioner must show that the failure to give the instruction rendered the trial fundamentally unfair. *Nickerson v. Lee*, 971 F. 2d 1125, 1138 (4th Cir. 1992), *cert. denied*, 507 U.S. 923 (1993) (stating that "[f]ailure to give an appropriate…instruction, without more, is not a violation of the Due Process Clause. Some other circumstances, demonstrating a serious miscarriage of justice, must be present.").

Here, Petitioner merely asserts that the lesser-included offense instruction should have been given. Petitioner does not allege, much less establish, that the failure to give the instruction rendered her trial fundamentally unfair. Moreover, the Court affords great deference to the state trial court and the Supreme Court of Appeals of West Virginia, which found the challenged instruction to be permissible. Therefore, the Court finds that the jury instructions given were not contrary to, or an unreasonable application of, clearly established federal law, and no relief can be granted.

*6. Prosecutor's Statement in Closing*

Petitioner claims, in full, that the "[p]rosecutor's misstatement of law at closing is in complete violation of petitioner['s] [d]ue [p]rocess rights as [g]uaranteed by [the] U.S. Constitution" (Petition, ECF No. 10-1 at 2) and "[p]rosecution['s] misstatement of law at closing cannot be overlooked as being anything but intentional and in violation of petition[er]s right to a fair trial." (*Id*. at 4). Respondent argues that this allegation is insufficiently pled because she failed to state in her Petition how the prosecutor misstated the law. (Mem. of Law in Supp. of Summ. J., ECF No. 15 at 10). However, Respondent gives Petitioner the "benefit of the doubt" and argues the allegation on the merits. (*Id*. at 11-14).

While it is not clear on the face of the Petition the specific statement Petitioner is alleging the state prosecutor misstated during her closing argument, there are two statements previously raised in state court that the Court will address: one on direct appeal to the Supreme Court of Appeals and the second to the state habeas court. In her direct appeal to the West Virginia Supreme Court of Appeals, Petitioner argues that the state prosecutor "incorrectly stated that possession Schedule I controlled substance was a

felony." (Resp't Ex. 4 at 29). During defense counsel's closing, he argued that "all we have here is possession" in an attempt to persuade the jury that Petitioner did not "deliver" a controlled substance to the decedent but merely jointly possessed the drug; he further explained that the punishment for possession of a controlled substance is only a misdemeanor, not a felony as required for a felony murder charge. (Resp't Ex. 3, Trial Tr. 49, Sept. 30, 2004). In the state's rebuttal, the prosecutor stated:

> What [Petitioner] did is she delivered those drugs that were ingested [by the decedent]. There's still the delivery. The crime is a delivery. [Defense counsel] quoted you a code section that says possession is a misdemeanor. Guess what, possession of a Schedule I substance is a felony.

(*Id*. at 60).

The second statement at issue was raised in Petitioner's state habeas petition. In the state habeas petition, Petitioner did not challenge the prosecutor's statement regarding possession of a controlled substance being a felony, but instead argued that the prosecutor improperly "instructed [the] jury that delivery does not mean sale." (Resp't Ex. 7, Am. Pet. for Writ of Habeas Corpus at 21). Specifically, the state prosecutor stated:

> Now you may think to yourself, well, is there a difference between delivery and sale. Delivery, ladies and gentlemen, is the common sense meaning of the word. It doesn't mean you have to be handed money for delivery to happen…If I hand you something, is that delivery? Yes. I've given it to you.

(Resp't Ex. 3, Trial Tr. 34).

The West Virginia Supreme Court of Appeals summarily denied Petitioner's direct appeal without setting forth any reasoning. (Resp't Ex. 5). The state habeas court summarily denied the remaining grounds raised by Petitioner, which included the allegation of prejudicial/improper statements made by the prosecution, because they lacked legal support and there was "very little or no factual support for the claims."

(Resp't Ex. 8, Order Den. Pet. for Writ of Habeas Corpus at 24). As stated above, when a state court summarily rejects a claim and does not set forth its reasoning, the federal court independently reviews the record and clearly established Supreme Court law. *See Bell v. Jarvis*, 236 F.3d at 163 (*quoting Bacon v. Lee*, 225 F.3d at 478). However, the court must still "confine [its] review to whether the court's determination 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Id.* at 158.

The Supreme Court has held that a prosecutor's misstatement of the law is not as grave as an error in the court's instruction to the jury. *See Boyde v. California*, 494 U.S. 370, 384-385, 110 S. Ct. 1190, 1200 (1990). The Court explained that counsel's arguments are "usually billed in advance to the jury as matters of argument, not evidence, and are likely viewed as the statements of advocates" while jury instructions are often "viewed as definitive and binding statements of the law." *Id.* at 384. The Court further explained that "the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made." *Id.* at 385.

Here, the prosecutor clearly misstated the law when she commented that possession of heroin was a felony. *See* W. Va. Code § 60A-4-401(c). The prosecutor also attempted to define the element of "delivery" for the jury during her closing. (Resp't Ex. 3, Trial Tr. 34). However, at the beginning of trial, the trial court gave brief instructions to the jury, which included reminding the jurors that the attorneys' opening and closing remarks "must not be evidence in the case" and that the court "will instruct you as to the law." (Resp't Ex. 2, Trial Tr. 49). When giving the jury instructions at the

close of the trial, the trial court judge indicated that the jurors are required "to apply the law as given [to] you by the Court." (Resp't Ex. 3, Trial Tr. 21). The instructions also highlighted that the underlying offense for the felony murder charge is delivery of a controlled substance, which was specifically referred to as "felonious delivery" by the court. (*Id.* at 21-23). Based on these instructions, the jurors were properly instructed that counsel's arguments were not to be considered evidence and that the trial court would instruct the jury on the law, not the attorneys. Moreover, the court provided the jury with instructions that the underlying offense necessary to sustain the felony murder conviction was delivery, not possession, and made clear that the jurors must find that Petitioner delivered the controlled substance in order to find her guilty of felony murder. (*Id.* at 23).

Additionally, it is clearly established federal law that the relevant inquiry into this claim is "whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)(*quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). Further, "it is not enough that the prosecutor's remarks were undesirable or even universally condemned."[10] *Id.* The inquiry focuses not on whether

---

[10] As a point of comparison, the *Darden* Court found that it was not a violation of due process when the prosecutor, among others, compared the defendant to an animal and tendered the following to the jury:

> "He shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash." "I wish [Mr. Turman] had had a shotgun in his hand when he walked in the back door and blown his [Darden's] face off. I wish that I could see him sitting here with no face, blown away by a shotgun." "I wish someone had walked in the back door and blown his head off at that point." "He fired in the boy's back, number five, saving one. Didn't get a chance to use it. I wish he had used it on himself." "I wish he had been killed in the accident, but he wasn't. Again, we are unlucky that time." "[D]on't forget what he has done according to those witnesses, to make every attempt to change his appearance from September the 8th, 1973. The hair, the goatee, even the moustache and the weight. The only thing he hasn't done that I know of is cut his throat."

the prosecutor's statements were improper, but rather if the comments deprived Petitioner of a fair trial. *Id.*

Even though the prosecutor misstated the law regarding the punishment for possession of a controlled substance and attempted to define the element of "delivery" for the jury, Petitioner has failed to demonstrate that such comments deprived her of a fair trial or "so infected the trial with unfairness" that Petitioner was denied due process. Accordingly, the state courts' determinations that these statements were not improper is not contrary to, or an unreasonable application of, clearly established federal law. Therefore, no relief can be granted.

*7. State Habeas Court's Failure to Hold an Evidentiary Hearing*

Petitioner claims that the state habeas court's failure to grant an evidentiary hearing for her case denied her due process. (Petition, ECF No. 10-1 at 4). This claim is not cognizable before this Court. The Fourth Circuit has adopted the rule that "claims of error occurring in a state post-conviction proceeding cannot serve as a basis for federal habeas corpus relief." *Bryant v. State of Md.*, 848 F.2d 492, 493 (4th Cir. 1988). Accordingly, the Court finds that Petitioner failed to raise a cognizable ground for relief.

*8. Ineffective Assistance of Counsel*

Petitioner contends that her counsel was ineffective for several reasons: (1) Appellate counsel was ineffective in failing to raise certain issues in the direct appeal; (2) Trial counsel was ineffective in failing to object to the prosecutor's misstatements in

---

*Darden*, 477 U.S. at 180, n.12.

closing; (3) Trial counsel was ineffective in failing to object to the jury instructions given once Count II of the indictment was dismissed. (Petition, ECF No. 10-1 at 4-5).

When a petitioner brings an ineffective assistance of counsel claim, counsel's conduct is measured under the two-part analysis in *Strickland v. Washington*, 466 U.S. 668 (1984). "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Id.* at 687. "Deficient performance is not merely below-average performance; rather, the attorney's actions must fall below the wide range of professionally competent performance." *Griffin v. Warden, Maryland Corr. Adj. Ctr.*, 970 F.2d 1355, 1357 (4th Cir. 1992).

Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. In order to demonstrate prejudice, Petitioner must show that but for his attorney's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687. Error by counsel which falls short of the constitutional ineffectiveness standard does not constitute cause, notwithstanding that the error may arise from inadvertence, ignorance, or strategic choice. *Murray v. Carrier*, 477 U.S. 478 (1986).

Moreover, as the Court has made clear, this review is done through the lens of § 2254, as modified by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). In looking at ineffective assistance claims through this lens,

> The pivotal question is whether the state court's application
> of the *Strickland* standard was unreasonable. This is

different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

*Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (internal citation omitted). Congress intended for AEDPA to raise the bar for relief in a 2254 case because it deals with claims that have already been litigated in state court. *Id*. at 786. Accordingly, "even a strong case for relief does not mean that state court's contrary conclusion was unreasonable. *Id*. (citing *Lockyer*, 538 U.S. at 71).

*(a) Appellate counsel was ineffective in failing to raise certain issues on direct appeal*

Petitioner argues that appellate counsel's ineffectiveness is demonstrated by his failure to raise claims on direct appeal. (Petition, ECF No. 10-1 at 4). Petitioner states that "his lack of advancing claims on direct appeal that clearly needed addressed, but sadly were not is the point in itself." (*Id*. at 4). However, Petitioner does not specify in her Petition which grounds her counsel should have asserted on appeal.

In her state habeas petition, Petitioner argued that appellate counsel delayed filing Petitioner's appeal, failed to raise the sufficiency of the indictment, failed to argue that the trial court erred by admitting statements made by Petitioner, and failed to challenge the constitutionality of the felony murder statute. (Resp't Ex. 7, Am. Pet. for Writ of Habeas Corpus at 9). The state habeas court found that these contentions lacked merit.

"The standard for reviewing a claim of ineffectiveness assistance of appellate counsel is the same as when reviewing the effectiveness of trial counsel." *Lucas v. McBride*, 505 F. Supp. 2d 329, 350 (N.D.W. Va. 2007); *see also Smith v. State of South Carolina*, 882 F.2d 895 (4th Cir. 1989), *cert. denied*, 493 U.S. 1046 (1990). The Supreme Court, in applying the *Strickland* factors to appellate counsel's performance, has held that a defendant:

> must first show that his counsel was objectively unreasonable, in failing to find arguable issues to appeal - that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them. If [the defendant] succeeds in such a showing, he then has the burden of demonstrating prejudice. That is, he must show a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal.

*Smith v. Robbins*, 528 U.S. 259, 285, 120 S. Ct. 746, 764, (2000). Moreover, the Sixth Amendment does not require that appellate counsel raise every nonfrivolous issue on appeal. In fact, the Supreme Court has recognized the importance of "having the appellate advocate examine the record with a view to selecting the most promising issues for review." *Jones v. Barnes*, 463 U.S. 745, 752 (1983). Additionally, in reviewing appellate counsel's performance, the court "must accord appellate counsel the 'presumption that he decided which issues were most likely to afford relief on appeal.'" *Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2000) (*quoting Pruett v. Thompson*, 996 F.2d 1560, 1568 (4th Cir.1993)).

Appellate counsel had no constitutional duty to raise every nonfrivolous issue possible on appeal. *Jones*, 463 U.S. at 751. Petitioner failed to demonstrate that appellate counsel was objectively unreasonable in failing to raise any specific issue on direct appeal. Petitioner's appellate counsel raised three substantive issues on direct appeal, all three of which are again raised by Petitioner here. Pursuant to *Bell*, the Court

presumes appellate counsel properly decided which issues were most relevant for a successful appeal. Additionally, Petitioner failed to show that but for counsel's failure to raise such issues, she would have prevailed on her appeal. Accordingly, no relief can be granted on this contention.

> *(b) Trial counsel was ineffective in failing to object to the prosecutor's misstatements in closing*

Petitioner claims that counsel's "failure to object to the prosecutor's misstatement of law at closing cannot be looked upon as any tactical defense decision, but rather just ineffective." (Petition, ECF No. 10-1 at 4). Petitioner did not raise this claim in her direct appeal to the Supreme Court of Appeals or to the state habeas court. Petitioner raised eight ineffective assistance of counsel contentions in her state habeas petition. (Resp't Ex. 7 at 3-9). Claim seven addressed trial counsel's performance at trial. (*Id*. at 8). Within this claim, Petitioner outlined six specific instances which amounted to ineffective assistance, including an allegation that trial counsel failed to object to comments made during the prosecutor's opening statement. (*Id*.). However, Petitioner never raised an ineffective assistance of counsel claim based on counsel's failure to object to the prosecutor's misstatement of law at closing in state court. Therefore, this claim appears not to be exhausted. This Court, however, will still consider the claim on the merits. *See* 28 U.S.C. § 2254(b)(2) (stating that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

As this Court discussed above, Petitioner failed to demonstrate that the prosecutor's comments during her closing argument deprived Petitioner of a fair trial or "so infected the trial with unfairness" that Petitioner was denied due process. *See supra*,

Part III.6.  Accordingly, Petitioner failed to show that she was prejudiced by counsel's failure to object to the statements during trial.  *See Strickland v. Washington*, 466 U.S. 668, 697 (1984) (stating that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").  Therefore, the Court finds that no relief can be granted.

> *(c) Trial counsel was ineffective in failing to object to the jury instructions given once Count II of the indictment was dismissed*

Petitioner claims that counsel "failed to object to the jury instructions once the underlying felony charge had been dropped."  (Petition, ECF No. 10-1 at 4).  As this Court discussed above, Petitioner argued on direct appeal that the court committed prejudicial error by not including a lesser included offense of delivery or possession of a controlled substance in the jury instructions.   (Resp't Ex. 4, Pet. for App. At 27).  However, Petitioner did not raise an ineffective assistance of counsel claim in state court regarding her counsel's failure to object to such instructions.  Therefore, this claim is unexhausted.  However, the Court will still address the claim on the merits pursuant to 28 U.S.C. § 2254(b)(2).

The Court finds that trial counsel did in fact object to the jury instructions at trial.  Specifically, when reviewing the instructions with the attorneys, the court asked: "If you want to note your objections to not including the lesser included," to which trial counsel responded: "I certainly do. Thank you. I object. There you go. So we're on the record." (Resp't Ex. 3, Trial Tr. at 16).  Accordingly, Petitioner is not entitled to habeas relief.

*9. Failure to Direct a Verdict in Favor of Petitioner*

Petitioner claims that her due process rights were violated by the court's failure to direct a verdict in her favor at the close of evidence. (Petition, ECF No. 10-1, at 2). Respondent does not address this claim in their Response or Motion for Summary Judgment.

Petitioner raised this claim in her direct appeal to the Supreme Court of Appeals of West Virginia. (Resp't Ex. 4, Pet. for Appeal at 19-27). The Supreme Court of Appeals summarily denied her appeal. (Resp't Ex. 5). Petitioner did not raise this issue in her state habeas petition.

West Virginia Rules of Criminal Procedure, Rule 29, Motion for Judgment of Acquittal, states that the court shall grant the motion "after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." W. Va. R. Crim. P. 29. This Court previously addressed Petitioner's arguments that claimed insufficient evidence existed to sustain her felony murder conviction. *See supra* Part III.1, III.2. The Court found that the jury had sufficient evidence before it to support its verdict that Petitioner's actions constituted "delivery" and that Petitioner was the actual cause of the victim's death. *See supra* Part III.1., Part III.2. This Court also noted that based on the testimony and evidence presented, the Court could not say that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *See supra* Part III.2, *citing Jackson*, 443 U.S. at 319. Based on the Court's prior findings that sufficient evidence existed to sustain Petitioner's conviction, the Court cannot grant relief on this ground.

*10. Additional Due Process Violations*

Petitioner claims generally throughout her Petition that her "due process rights have been violated as guaranteed by the U.S. Constitution as a result of the above mentioned actions of the court, but not limited to just those mentioned." (Petition, ECF No. 10-1 at 2-3, 3,4, 4-5). Petitioner does not specify what additional grounds may exist or what specific actions violated her rights. Respondent argues that "[s]uch conclusory allegations with no factual support at all do not satisfy the fact pleading requirement of Rule 2 of the Federal Habeas Rules."

Although *pro se* petitions are to be liberally construed as set forth in *Haines v. Kerner*, 404 U.S. 519 (1972), habeas petitions must meet heightened pleading requirements. *McFarland v. Scott*, 512 U.S. 849 (1994). "[N]otice pleading is not sufficient, for the petition is expected to state facts that point to a real possibility of constitutional error." *Blackledge v. Allison*, 431 U.S. 63, 75, n. 7 (1977) (internal quotations omitted). A habeas petitioner must come forth with evidence that a claim has merit. *Nickerson v. Lee,* 971 F. 2d 1125, 1136 (4th Cir. 1992), cert. denied, 507 U.S. 923 (1993). Unsupported, conclusory allegations do not entitle a habeas petitioner to relief. *Id.*

The Court agrees with Respondent that Petitioner failed to meet the heightened pleading requirements for federal habeas petitions. Accordingly, no relief can be granted on this ground as presented so generally.

## IV. CONCLUSION & RECOMMENDATION

The Court finds that the state decision in Petitioner's case was not contrary to, or an unreasonable application of, clearly established federal law. Further, the state court did not base its decision on an unreasonable application of the facts. Thus, Petitioner is not

entitled to habeas relief under § 2254. Accordingly, the undersigned recommends that Respondent's Motion for Summary Judgment (ECF No. 14) be **GRANTED** and the habeas petition (ECF No. 10) be **DISMISSED WITH PREJUDICE**. The undersigned further recommends that the petitioner's Motion to Compel (ECF 24) and Motion to Appoint Counsel and for Evidentiary Hearing (ECF 25) be **DENIED AS MOOT**.

Any party may, within fourteen [14] days of the filing of this recommendation, file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections shall also be submitted to the United States District Judge of record. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985): *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to mail a copy of this Report and Recommendation to the pro se plaintiff by certified mail, return receipt requested, to her last known address as reflected on the docket sheet, and to any counsel of record, as applicable.

**Date Entered:** January 8, 2014

*/s/ James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE